Richard L. Charnley (State Bar No. 70430)
Annie Rian (State Bar No. 260960)
**CHARNLEY RIAN LLP**
12121 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
Telephone:   310.321.4300
Facsimile:   310.893.0273
Email:       rlc@charnleyrian.com
             ar@charnleyrian.com

Attorneys for Plaintiff DONALD P. BORCHERS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD P. BORCHERS,<br><br>               Plaintiff,<br><br>        v.<br><br>THE WEINSTEIN COMPANY, LLC d/b/a DIMENSION FILMS; MIRAMAX, LLC; THE WALT DISNEY COMPANY; and DOES 1 through 50, inclusive,<br><br>               Defendants. | Case No.  2:17-cv-6263<br><br>**COMPLAINT FOR DECLARATORY RELIEF (28 *U.S.C.* 2201)**<br><br>**REQUEST FOR JURY TRIAL** |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff alleges the following against Defendants and each of them:

### Jurisdiction, Venue and The Parties

1.     This is an action seeking declaratory relief regarding rights, as alleged below, to a copyrighted work by Stephen King (U.S. Copyright B00000204066, renewed RE000921889).  Also involved is the film "Children of the Corn" (U.S. Copyright V2024P222), and certain characters depicted in the film. U.S. Copyright

Office, *Compendium of U.S. Copyright Office Practices* 818.4(H) "Characters."

*Christensen v. Harris County* (2000) 529 U.S.576, 587 (re consideration of

administrative manuals and similar materials).   As alleged herein, the rights in

Stephen King's copyrighted work have been divided and are held by different

parties.  This action, therefore, seeks relief arising under an Act of Congress

relating to copyrights and the authorization of exclusive rights thereunder (17 *USC*

101; 106) and is subject to the exclusive jurisdiction of this Court as provided in 28

*USC* 1338.  In addition, the contracts referenced below place jurisdiction in the

State of California and the Federal Courts of California.

2.      Declaratory relief is sought pursuant to 28 *USC* 2201, which is

available in intellectual property settings.  *Medimmune Inc. v. Genetech, Inc.* (2007)

549 U.S. 118.

3.      The United States District Court, Central District of California is the

proper venue for this action under 28 *USC* 1391 because, as alleged below, a

substantial part of the events or omissions giving rise to this action occurred in this

judicial district.

4.      Plaintiff Donald P. Borchers ("Borchers") is a resident of the State of

Florida. He is a producer, director, and writer in the entertainment industry.

5.      On information and belief, Defendant Miramax LLC ("Miramax") is a

limited liability company licensed to do business in the State of California,

maintaining its principal place of business in the City of Santa Monica, State of California.

6.      On information and belief, Defendant Walt Disney Company ("Disney") is a corporation licensed to do business in the City of Burbank, State of California.

7.      On information and belief, Defendant The Weinstein Company, LLC ("TWC"), d/b/a/ Dimension Films ("Dimension") is a business entity organized under the laws of the State of Delaware.  Dimension's principal place of business is in New York, New York.  Reference to "Dimension" in this pleading shall include TWC.

8.      Borchers is ignorant of the true names and capacities of those defendants named herein as Does 1 through 50 and therefore sues these defendants by their fictitious names.  Borchers will seek leave to amend this Complaint to assert the true names and capacities of said Doe Defendants when, and if, they have been ascertained.

9.      On information and belief, each of the Defendants herein, whether individually named or, in the case of Does, collectively named, is the agent, principal, employer, employee, partner, joint-venturer, managing member, officer or director of each other Defendant and in such capacity, was, at all times, acting with full authority of each other Defendant.  On further information and belief, each

of the Defendants named herein authorized and/or ratified the acts of each other Defendant.

### Terms of Art

10.     In this Complaint, three terms of art are used, namely "Remake," "Sequel" and "Spin-off". The following provides an analysis of these terms.

11.     **Remake:**  A motion picture Remake is a film "...that is based on an earlier work and tells the same story…" *Wikipedia.*[1] *FRE* Rule 803 (18)(A). Essentially, it is a re-telling of the original story. When a remake is anticipated to spawn sequels it is called a "Reboot." Remake is used when the film is to be a "stand-alone" or "one-off." AN AFFAIR TO REMEMBER, a 1957 American romance film, was a remake of the 1939 film, LOVE AFFAIR. *Wikipedia.*[2]

12.     **Spin-off:** A motion picture Spin-off is a motion picture "...derived from one or more already existing works, that ... focuses [on] a substantial change in narrative viewpoint and activity from that (previous) storyline ... and **is a shift to that action and overall narrative thread of some other protagonist**(s), which now becomes the central or main thread (storyline) of the new sub-series..." *Wikipedia.*[3] (emphasis added).  A Spin-off follows the original story in a different way, typically developing the story of one of the co-starring or ancillary characters.

---

[1] see Exhibit, "A", https://en.wikipedia.org/wiki/Remake. Page 32 (Arabic numbers cite to consecutive page of this document where the Exhibit is found).

[2] see Exhibit, "B", https://en.wikipedia.org/wiki/An_Affair_to_Remember.   Page 36

[3] see Exhibit, "C", https://en.wikipedia.org/wiki/Spin-off_(media).  Page 40

13.   **Sequel:** And, a motion picture sequel is a film "...that continues the story of, or expands upon, some earlier work..." *Wikipedia*.[4] It is a continuation of the original story. When a Sequel continues the prior story it is called a Pre-quel. Sequel rights typically include Pre-quel rights.

### Remakes and Spin-offs Are Two Different Things

14.   "THE MATRIX reboot is not a remake or reboot, according to screenwriter Zac Penn – who alludes to a spin-off." *Daily Express*, March 17, 2017.[5] and, "While original reports claimed 'The Matrix' was being rebooted, writer Zak Penn took to Twitter Friday to clarify he's instead working on a spinoff project set within the Matrix universe." *Digital Trends* , March 17, 2017.[6]  *FRE* Rule 803(18)(A).

### Sequels and Spin-Offs Are Two Different Things

15.   A spin-off, not a sequel, to SUICIDE SQUAD is in the works, "... Warner Bros. has been developing a spinoff with the help of Robbie …" *The Hollywood Reporter*, August 9, 2016[7].  *FRE* Rule 803(18)(A) and, "WE'LL GET MORE MARGOT ROBBIE AS WARNER BROS. AND DC DEVELOP 'HARLEY QUINN VS. THE JOKER' SPINOFF" *Maxim*, July 23, 2017.[8] *FRE* Rule

---

[4]see Exhibit, "D", https://en.wikipedia.org/wiki/Sequel  Page 54

[5] see Exhibit, "E" Page 62

[6] see Exhibit, "F" Page 65

[7] see Exhibit, "G" Page 68

[8] see Exhibit, "H" Page 70

803(18)(A).  And, "... the yet-to-be-confirmed project seems to be in addition to Suicide Squad 2 …" *The Express Tribune*, July 24, 2017[9] which, again, differentiates the Suicide Squad 2 sequel from the Harley Quinn spin-off, which spins off the character, Harley Quinn. *FRE* Rule 803(18)(A).

16.  CREED is a Spin-off of ROCKY, not a sequel, "...director Ryan Coogler says he never imagined setting his "Rocky" spin-off anywhere but Philadelphia, the location of the original "Rocky" movie and its five sequels…" *The Morning Call*, August 7, 2017[10]. *FRE* Rule 803(18)(A) and, "Based on characters created by Sylvester Stallone 40 years ago, Coogler's story was ultimately approved by Stallone himself, but getting that green light wasn't easy. "I was dead set against it," Stallone revealed of his initial reaction to the notion of a spinoff film." *Total Rocky*, November 3, 2015[11]  *FRE* Rule 803(18)(A) and, "A new screenplay titled "Drago" was filed with the copyright office, based on Sylvester Stallone's popular Rocky IV character, Ivan Drago, played by actor Dolph Lundgren in the 1985 Rocky movie." *Total Rocky*, November 3, 2015[12] This spin-off follows the character, Drago.

17.  THE TRANSFORMERS has spawned both sequels and spin-offs. "...Paramount has planned at least 14 sequels and spin-off movies... one of the

---

[9]  see Exhibit, "I" Page 71
[10] see Exhibit, "J" Page 73
[11] see Exhibit, "K" Page 79
[12] see Exhibit, "L" Page 88

Transformers spin-off movies to take place in Ancient Rome... (while) The fifth movie in the Transformers franchise expands the mythology of the world, revealing that Autobots and Decepticons have been interfering in human history since medieval England, appearing again in World War II, and presumably other time periods as well…" *Slash Film*, June 14, 2017[13] *FRE* Rule 803(18)(A) and, "...John Cena has nabbed a lead role in the Transformers spinoff Bumblebee…" *The Hollywood Reporter*, July 31, 2017[14]  *FRE* Rule 803(18)(A). Discussions of non-starring character spin-offs abound, "…A common complaint about the Transformers movies is that the robots take a backseat to the humans. Sam Witwicky, Cade Yeager—these are the main characters of the Transformers movies, not Optimus Prime and Megatron. You might think a spinoff film focusing on one specific Transformer could change that. But don't hold your breath. The Hollywood Reporter is reporting that Hailee Steinfeld is in talks to star in the 2018 Bumblebee Transformers spin-off, from Kubo and the Two Strings director Travis Knight. She'll play "a tomboy who also holds a job as a mechanic after school,"…" *Gozmodo io9*, May 31, 2017[15].  *FRE* Rule 803(18)(A).And that is why this is a spin-off in the TRANSFORMERS series, and not a sequel, because it follows an ancillary character, not the main story, itself.

---

[13] see Exhibit, "M" Page 93
[14] see Exhibit, "N" Page 94
[15] see Exhibit, "O" Page 96

18.   Michael Douglas' ex-wife, Diandra who is entitled to share future Spin-off income with Michael, brought suit against Michael for her share of WALL STREET 2. Michael's defense was that WALL STREET 2 was a Sequel and not a Spin-off, and Diandra was not entitled to Sequel money. "... Sequels, (his lawyer, Marilyn) Chinitz said, are not spinoffs, and Diandra has no right to any money from a sequel. "They're not the same thing," she said... **Justice Cooper indicated that he thought there was a difference between a spinoff and a sequel as well**…" *New York Post*, June 28, 2010[16]  (emphasis added).  *FRE* Rule 803(18)(A).

## Remakes and Sequels Are Two Different Things.

19.   This is, perhaps, best illustrated by the well-known movie, KING KONG.  "King Kong is a giant movie monster, resembling a giant ape, that has appeared in various media since 1933. The character first appeared in the 1933 film King Kong from RKO Pictures, which received universal acclaim upon its initial release and re-releases. A sequel quickly followed that same year with Son of Kong, featuring a Little Kong. In the 1960s, Toho produced King Kong vs. Godzilla (1962), pitting a much larger Kong against Toho's own Godzilla, and King Kong Escapes (1967), based on The King Kong Show (1966–1969) from Rankin/Bass Productions. In 1976, Dino De Laurent is produced a modern remake of the original film directed by John Guillermin. A sequel, King Kong Lives,

---

[16] see Exhibit, "P" Page 98

followed a decade later featuring a Lady Kong. Another remake of the original, this time set in 1933, was released in 2005 from filmmaker Peter Jackson." *Variety*, February 8, 2017. *Wikipedia.*[17] *FRE* Rule 803(18)(A).

### Sequels Continue a Franchise, Spin-Offs Expand a Franchise.

20.     After Disney purchased LucasFilm in October, 2012, Forbes reported, "The Mouse House has already scheduled a seventh film in the Star Wars saga to be directed by J.J. Abrams and scheduled to hit theaters in 2015. Now comes reports that Disney will begin exploiting the broader Star Wars universe with spin-off movies featuring Han Solo and Boba Fett." *Forbes*, February 6, 2013.[18] There are 9 films in the Star Wars Franchise: an original, 5 Sequels and 3 prequels. The spin-offs follow a co-starring character, Han Solo and an ancillary character, Boba Fett. A distinction is made from sequels when referring to this film, a spin-off and not a sequel, "... actress Phoebe Waller-Bridge is in talks for a key role in the upcoming "Star Wars" Han Solo spinoff starring  Alden Ehrenreich …" *Variety*, February 8, 2017,[19] and, "...'Star Wars' Han Solo Spinoff: Lord & Miller Fired After Clashing With Kathleen Kennedy …" *Variety*, June 20, 2017[20] and, "... Star Wars: Episode VII will launch a new trilogy next year, with Star Wars: Episode VIII following in 2017 and Star Wars: Episode IX coming in 2019. LucasFilm is also planning an

---

[17] see Exhibit, "Q" https://en.wikipedia.org/wiki/King_Kong Page 101
[18] see Exhibit, "R" Page 106
[19] see Exhibit, "S"  Page 108
[20] see Exhibit, "T"  Page 110

Untitled Star Wars Han Solo Spin-Off and Untitled Star Wars Boba Fett Spin-Off to debut in 2016 and 2018 …" *Movieweb*, January 17, 2014[21] *FRE* Rule 803(18)(A)(3) and, "... And, big news "Star Wars" fans: Disney, which announced it would buy LucasFilm last year, plans to make spinoff movies based on characters in addition to the three sequels it had previously announced …" *CNBC*, February 5, 2013[22] *FRE* Rule 803(18)(A). The point is illustrated clearly here that spin-offs are based on characters. *FRE* Rule18(A)(3).

21.    "...Lionsgate has won a bidding war to pick up a female- centric spec action script titled Ballerina that will serve as a platform for a possible John Wick spinoff... Lionsgate is relishing the idea of a franchise expansion…" *The Hollywood Reporter,* July 25, 2017.[23] *FRE* Rule18(A)(3).

22.    "...The Conjuring franchise continues to expand, with New Line Cinema getting to work on a Conjuring 2 spinoff based around the character of the Crooked Man... The Crooked Man made his first appearance in The Conjuring 2 (the sequel to The Conjuring)... The Crooked Man, the next chapter in this growing universe... The next spinoff from the main film series will be The Nun..." *The Hollywood Reporter*, June 14, 2017.[24] *FRE* Rule18(A)(3).

---

[21] see Exhibit, "U" Page 116
[22] see Exhibit, "V" Page 114
[23] see Exhibit, "W" Page 118
[24] see Exhibit, "X" Page 121

23.     For Lionsgate, the sequels to DIVERGENT have stopped performing, so they are expanding their franchise with a TV spin-off, "...Lionsgate has opted to skip theaters for the planned finale, The Divergent Series: Ascendant. Instead, the dystopian YA saga will conclude with a TV movie that will then launch a standalone spinoff TV series..." *Slash Film*, July 20, 2016.[25] *FRE* Rule18(A)(3).

### Chain of Title to "Children of the Corn"

24.     On information and belief, in 1977, Stephen King copyrighted a novella named "Children of the Corn" ("the Novella") (U.S. Copyright B00000204066; RE 0000921899).

25.     On information and belief, in or about August 1983, a company known as New World Pictures acquired the motion picture and allied rights to the Novella other than certain literary rights retained by Steven King.

26.     In 1984, New World produced and distributed a feature film based on the Novella (herein "the Original Film") (U.S. Copyright V2024P222).

27.     On November 28, 1989, New World granted to a company known as Oceana Distributors L.P. ("Oceana") all of New World's right, title, and interest in and to New World's film library ("the Library"), which included the Original Film, but New World retained U.S. television distribution rights to the Library and

---

[25] See Exhibit "Y" Page 124

television remake, sequel and spin-off rights.  In 1997 Fox Television merged with New World, thus making Fox TV the successor to the rights held by New World.

28.     Oceana became Trans Atlantic Distributors, L.P. ("Trans Atlantic") , and by a series of transactions that concluded in 1991, Park Avenue Entertainment ("Park Avenue") became the assignee of Oceana/Trans Atlantic's rights in the Original Film itself, not the entire Library, namely, the right to produce remakes, sequels, spin-offs, merchandising, and the like.

29.     In 1994 Park Avenue entered into an agreement with Miramax, at the time a division of Disney, concerning the Original Film only, permitting Miramax the right to make only sequels or remakes of the Original Film, a copy of which is attached hereto as Exhibit Z and incorporated herein by this reference ("the 1994 Agreement" – 127, etc.)[26].  In the 1994 Agreement, Park Avenue did not transfer the distribution rights held by Oceana/Trans Atlantic to the Original Film. In the 1994 Agreement, Park Avenue expressly retained for itself all rights to the first sequel (previously made) and second sequel (on information and belief, not yet then released) to the Original Film (collectively, the "Park Avenue Sequels").  In the 1994 Agreement, Park Avenue expressly retained for itself any elements of the Original Film or any of the Park Avenue Sequels, including specifically the "characters portrayed therein or the title thereof" (See Exhibit Z, the 1994

---

[26] Arabic numbers following references to Exhibits Z, AA, and BB are to the consecutively numbered pages of this Complaint, not the internal numbers of the exhibits themselves.

Agreement, paragraph 1.f. – page 127).  This is a document pertaining to copyright. 37 *C.F.R.* 201.4(a)(2).

30.     In 2005 Park Avenue entered into an agreement with Miramax, at the time a division of Disney, regarding the Original Film ("the 2005 Agreement"), a copy of which is attached hereto as Exhibit A and incorporated herein by reference. In the 2005 Agreement, Miramax acquired only the remake rights to the Original Film (and ancillary rights associated therewith).  Exhibit A, paragraph 1. This is a document pertaining to copyright.  37 *C.F.R.* 201.4(a)(2).

31.     As a result of these transactions, the rights associated with the Novella had been divided into five pieces.

        a.     One piece belonged to Stephen King (literary rights).

        b.     One piece was distribution of the Original Film (but not on US TV).

        c.     One piece was Fox Television's right to US TV distribution of the Original Film as well as TV remakes, sequels and spinoffs, and in fact Borchers produced a television remake of the Original Film for Fox Television that was aired in 2009 with no objection.

        d.     One piece was Disney/Miramax's non-TV remake rights that was derived from the 2005 Agreement.

        e.     One piece was Park Avenue's right to everything else, including sequels, spinoffs, graphic novel, merchandising, video games, etc.

32.     Later in 2005 Bob Weinstein & Harvey Weinstein, acquired the label "Dimension Films" and left Miramax (which continued as a division of Disney). They formed TWC.

33.     On information and belief, through its acquisition of Dimension, TWC obtained from Disney an option only for those rights obtained by Miramax under the 2005 Agreement.

34.     Disney remained a participant in future/ongoing productions by either Miramax or TWC.

35.     In November 2016, Graphic Novel Enterprises ("Graphic Novel") purchased all of Park Avenue's right, title, and interest, in and to the Original Film. (See paragraph 29e. above.)

36.     On July 27, 2017, Borchers acquired all of the rights that Graphic Novel obtained from Park Avenue.

**Why Plaintiff Needs Declaratory Relief**

37.     A dispute has arisen between and among Borchers and Defendants regarding the ownership of the right to produce remakes, sequels and spin-offs of the Original Film.   Borchers contends that Graphic Novel purchased these rights from Park Avenue, and he, in turn, obtained these rights from Graphic Novel.

38.     In support, Borchers provides the following:

        a.     That Defendants' right, under the 2005 Agreement, to make any version of the Original Film is limited to one such film, and once that version

is made, Borchers, and not the Defendants, has the right to remake the Original

Film (Exhibit AA, first paragraph --- page 146).

        b.      In addition and alternatively, after the sixth sequel of the

original film was produced in 2001, there was never an assignment of sequel

rights to the Defendants for the Original Film, and Borchers, not the

Defendants, has the right to make sequels; and,

        c.      In addition and alternatively, that the rights to make spin-offs of

the Original Film were expressly reserved by Park Avenue, and Borchers, not

the Defendants, has the right to make spin-offs (Exhibit Z, paragraph 1.f. --

127).

39.      Borchers has asked Defendants to admit that he is the owner of these

rights to the Original Film, but they have either refused to do so or have disputed

his claims, affirmatively asserting "adverse legal interests".  Hence, Defendants

have placed Borchers in the position of having to choose between engaging in

arguably infringing activity (producing a film) or abandoning his right to exploit his

rights.  This has created an actual and substantial controversy between Borchers and

Defendants  *SanDisk Corp. v. STMicroelectronics, Inc.* (Fed.Cir. 2007) 480 F.3d

1372; *IMS Healty, Inc. v. Vality Tch, Inc.* (E.D. Pa. 1999) 59 F.Supp.2d 454

(declaratory judgment in copyright context).

40.     Borchers produced both the Original Film in 1984 and a TV remake in

2009 --- which was for Fox TV, one of the holders of the five rights alleged in

paragraph 29. c. above --- and intends to produce further films based on the Original Film, including a spec script that he has written as a spin-off of the Original Film.

41.    Absent this Court's declaration of Borchers' rights, and a resolution of legal uncertainties, he cannot submit any production, or even his spec script, for Copyright registration without concern for engaging in a potentially unlawful use or facing criminal liability.  17 *USC* 103(a); 17 *USC* 506(e).  And, if Borchers is able to produce, because the Defendants have denied, or refused to acknowledge, his rights, Borchers faces a potential infringement action by the Defendants.  See *Medimmune, Inc. v. Genentech, Inc*. (2007) 549 U.S. 118, fn. 11**.**

## FIRST CAUSE OF ACTION --- REMAKE RIGHTS

42.    Borchers incorporates herein paragraphs 1 through 41 above.

43.    As alleged above, as and for a first alternative cause of action for declaratory relief, Borchers contends that the Defendants' right, under the 2005 Agreement, to make any version of the Original Film is limited to one such film, a contention which Defendants have disputed or with which they have refused to agree.

44.    In support, Borchers provides the following:

a.    In the 1994 Agreement, the "factual recitals" reference "certain remake and sequel rights" owned by Park Avenue and further reference Miramax's wish to acquire the "right to make future sequels" (Exhibit Z, page

127). Opposing the "plural" aspect of the 1994 Agreement (i.e. "future sequels"), the first paragraph of the 2005 Agreement (Exhibit AA, page 146) confirms that Miramax was obtaining rights in connection with Miramax's "development and possible production of a (single) motion picture" not "development and possible production of (multiple) motion pictures."  The factual recitals are conclusively presumed to be binding between the parties or their successors in interest. *FRE* Rule 301, 302.  *Cal. Evid. Code* 622.  *Plaza Freeway Limited Partnership v. First Mountain Bank* (2000) 81 Cal.App.4th, 616.  Further, where, as here, there are several contracts relating to the same matters between the same parties they are viewed together.  *Cal.Civ.Code* 1642. *Midori Kondo v. Anthelio Healthcare* (2015) 2015 WL 7710301; *Pellegrini v Weiss* (2008) 165 Cal.App.4th 515, 534.

  b. As alleged above, the 2005 Agreement (Exhibit AA, page 146) unambiguously provides Defendants only a one picture license, "… Company's purchase of all rights (as defined herein below) … in connection with company's development and production of a [singular, not plural] motion picture."  The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve absurdity.  *Cal.Civ.Code* 1638.  F.B.T. Productions v. Aftermath Records (2010) 621 F3d 958.  There need to be nothing else considered other than the writing.  *Cal.Civ.Code* 1639.

c.   The whole of a contract is to be taken together.  *Cal.Civ.Code* 1641. *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10Cal.App.5[th]. Other provisions of the 2005 Agreement consistently refer to a single, not multiple, motion picture:

(1)   Paragraph 2 specifies a production bonus applicable to "the Picture," not "Pictures" (Exhibit AA, page 146/147).

(2)   Paragraph 2 specifies the formulae for calculating the production bonus for "the Picture", not "Pictures" (Exhibit AA, page 146/147)

(3)   Paragraph 3 specifies Box Office Bonuses for "the Picture", not "Pictures" (Exhibit AA, page 147).

(4)    Paragraph 5.B specifies, in relevant part, "… Company agrees to indemnify Owner from and against any losses, liabilities, costs, damages or expenses … incurred from Company's development, production, distribution advertising or exploitation of the Picture…" , not "Pictures." (Exhibit AA, page 148). Had the 2005 Agreement involved multiple pictures, multiple indemnifications would have been provided but they were not.  *Cal.Civ.Code* 1644, 1645.

(5)   The 2005 Agreement was drafted by Miramax, not Park Avenue (Exhibit AA, page 146), hence even if there were an ambiguity or uncertainty in the language of that agreement (there is none), it must be interpreted against

Miramax and its successors, and not against Borchers who now is a successor in interest to Park Avenue. *Cal.Civ.Code* 1654.

(6)     Nowhere does the 2005 Agreement mention or refer to anything other than "the Picture." *Cal.Civ.Code* 1641. *Cachil Dehe Band of Wintun Induans v. California* (2009) 629 F.Supp.2d 1091.

(7)     If there were an intent to create a multi-picture license in the 2005 Agreement, that Agreement would have so stated.  For example, the indemnity provision would have so stated and the first paragraph would have so stated.  A court cannot revise agreements under the guise of construing them. *Hinckley v. Bechtel Corp.* (1974) 41 Cal.App.3d 206, 210, and pursuant to *Cal.C.C.P.* 1858 "the office of the Judge is ... not to insert what has been omitted". *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753. "The court ... cannot insert in the contract language which one of the parties now wishes were there." *Series AGI v. Eves* (2013) 217 Cal. App. 4th 156, 164.

(8)     Paragraph 9 (Exhibit AA, page 149) specifies, in relevant part, "… All of the principal deal terms which close this Agreement are those terms stated herein," meaning that there are no oral agreements.  Hence the 2005 Agreement is integrated and cannot be varied, altered or contradicted by prior oral declarations.  Restatement Second of Contracts Section 210(1) or ancillary

agreements.  *Cal.Civ.Code* 1625.  *Cal.C.C.P.* 1856.  *Julius Castle Restaurant v. Payne* (2013) 216 Cal.App.4th 1423.

d.       In 2011, pursuant to the 2005 Agreement, Dimension produced and distributed the Picture.

45.       Absent this Court's declaration of Borchers' rights, and a resolution of legal uncertainties, he cannot submit any production, or even his spec script, for Copyright registration without concern for engaging in a potentially unlawful use or facing criminal liability.  17 *USC* 103(a); 17 *USC* 506(e).  And, if Borchers is able to produce, because the Defendants have denied, or refused to acknowledge, his rights, Borchers faces a potential infringement action by the Defendants.  See *Medimmune, Inc. v. Genentech, Inc*. (2007) 549 U.S. 118, fn. 11**.**

## SECOND CAUSE OF ACTION --- SEQUEL

46.       Borchers incorporates herein paragraphs 1 through 45 above.

47.       As alleged above, as and for an additional second alternative cause of action for declaratory relief, Borchers contends that after the production and distribution of a sixth sequel in 2001, there was never an assignment of sequel rights to the Defendants for the Original Film, a contention which Defendants have disputed or with which they have declined to agree.

48.       In support, Borchers provides the following:

a.       Subsequent to the sixth sequel in 2001, there was never an assignment of sequel rights from Park Avenue to the Defendants, thus showing

how the parties treated those rights because their conduct is the most reliable

evidence of their intention. *Kennecott Corp. v. Union Oil Co.* (1987) 196

Cal.App.3d 119.

   b. In 1994, Miramax followed a business practice that differed

significantly from industry norms.  Rather than spend a larger sum of money

upfront to acquire all derivative rights in the Original Picture, in 1994

Miramax chose to spend a smaller sum and acquired only the right to make

one remake or sequel and was provided the conditional right to acquire the

rights to future remakes or sequels based on the Original Film ("the Future

Productions").  On information and belief, in 2001, Miramax satisfied the

conditions; however, Miramax did not take steps to acquire the Future

Productions.  After releasing the sixth sequel in 2001, Miramax abandoned

making installments of the Original Film. On November 18, 2004 Borchers

called Elliot Slutsky, then head of distribution for Miramax, and informed him

that Borchers had just written a spec remake of the Original Film.  Elliot

Slutsky stated that Miramax had abandoned the franchise because of declining

sales (it was no longer theatrically viable and the home video market was

getting too tough), the franchise had wound down, and he was not interested in

trying to exploit any Future Productions.  But after Borchers explained his

agenda to re-boot the franchise with a remake instead of extending the current

series with an additional entry, Elliot Slutzky knew of the spate of horror

remakes[27], saw the difference, and subsequently agreed to talk to Bob

Weinstein about joining that wagon train.  Responsively, later on the same day,

November 18, 2004, Josh Greenstein Bob Weinstein's assistant contacted

Borchers and confirmed that Miramax was not interested in continuing the

current franchise, but that Miramax was most interested in the idea of

rebooting the franchise with a remake.  Josh Greenstein told Borchers that

Andrew Rona, a production executive with Miramax, would reach out to

him.  During November and December 2004 and January and February 2005,

Borchers followed up with a few calls and left messages with Josh Greenstein

and Andrew Rona.  Knowing that Borchers was interested in producing a

remake of the Original Film, and agreeing with Borchers that a remake was

worthwhile, on information and belief, Miramax discovered that the right to

remake the Original Film had not been acquired from Park Avenue pursuant to

paragraph 5 of the 1994 Agreement.  On information and belief, according to

Chuck Shepard, counsel for Dimension, Park Avenue disputed that the 1994

Agreement automatically transferred remake rights to Miramax.  Hence,

without telling Borchers, Miramax commenced negotiations with Park

Avenue.  On February 11, 2005, Miramax successfully completed the

negotiation by closing its purchase of the (executory) remake rights from Park

---

[27] The Ring (2002), Carrie (2002), The Texas Chainsaw Massacre (2003), Willard (2003), Dawn of the Dead (2004), The Amityville Horror (2005), The Cabinet of Dr. Caligari (2005), Dark Water (2005), The Fog (2005)

Avenue, pursuant to the right to acquire Future Productions as provided in the 1994 Agreement.  *Southern California Edison v. Superior Court* (1995) 37 Cal.App.4th 839, 551.

        c.       The 2005 Agreement (Exhibit AA, page 149), thus, is evidence that the 1994 Agreement (Exhibit Z, page 126) remained executory, and that further steps (the 2005 Agreement) were therefore needed for Miramax to obtain further rights.  But in taking those steps and entering into the 2005 Agreement (Exhibit AA, page 149), Miramax chose not to acquire sequel rights and continued to abandon them: the 1994 Agreement (Exhibit Z, page 126) is fully integrated (the entire understanding of the parties with no other written or oral understandings), and Miramax's conduct further demonstrated that it had the right to, and was acquiring, only one film, opting for a "remake."  *Restatement Second of Contracts* Section 210(1) .  *Cal.Civ.Code* 1625.  *Cal.C.C.P.* 1856.  *Kennecott,* supra.  *Crestview,* supra.  Further, a court cannot **rewrite** a contract to relieve a party from what he now contends may be a "bad deal" or to give him a better deal than he negotiated. *Naify v. Pacific Indemnity Co*. (1938) 11 Cal.2d 5, 11.

        d.       Paragraph 9 of the 2005 Agreement (Exhibit AA, page 149) states, in relevant part: the 1994 Agreement (Exhibit Z, page 126) defined "Rights" to include both remake and sequels if a transfer of rights occurred pursuant to paragraph 5 of that Agreement; the 2005 Agreement, intentionally

redefined "Rights" to include only remake; the 2005 Agreement contains no mention of sequel rights – which remained with Park Avenue; the 1994 Agreement specifically withholds from Miramax each and every right not granted therein; the 2005 Agreement specifically withholds from Miramax each and every right not granted therein; the 1994 Agreement provides a choice for either remake **or** sequel, not a choice for both remake **and** sequel; in the 2005 Agreement, Miramax **chose** to acquire remake, not sequel, rights; the assignment of rights contemplated under paragraph 5 of the 1994 Agreement was not self-executing, , using "future tense" verbs such as "shall," and requiring Miramax to **make a choice** between remake or sequel; consideration was paid by Miramax to acquire remake rights only via the 2005 Agreement; no consideration was paid by Miramax via the 2005 Agreement or via any other agreement to acquire any other rights; the 1994 Agreement, paragraph 5 (Exhibit Z, page 130), states, in pertinent part, "Seller agrees to execute and deliver a short form assignment in substantially the form as Exhibit "A" (Exhibit Z, page 144) evidencing the grant of the Rights with respect to all future remakes or sequels based on the Original  Picture in 2010, Defendants caused to be filed with the United States Copyright Office a Short Form Assignment of rights to remake the Original Film, but since 2001, Defendants have caused no other such filings, including a filing for sequels. *Cemetery, supra; Kennecott, supra;* "The court ... cannot insert in the contract language

which one of the parties now wishes were there." *Series AGI v. Eves* (2013) 217 Cal. App. 4th 156, 164.

48.     Absent this Court's declaration of Borchers' rights, and a resolution of legal uncertainties, he cannot submit any production for Copyright registration without concern for engaging in a potentially unlawful use or facing criminal liability.  17 *USC* 103(a); 17 *USC* 506(e).  And, if Borchers is able to produce, because the Defendants have denied, or refused to acknowledge, his rights, Borchers faces a potential infringement action by the Defendants.  See *Medimmune, Inc. v. Genentech, Inc*. (2007) 549 U.S. 118, fn. 11**.**

### THIRD CAUSE OF ACTION --- SPIN-OFF

49.     Borchers incorporates paragraph 1 through 48 above.

50.     As alleged above, as and for an additional third alternative cause of action for declaratory relief, Borchers contends that the rights to make spin-offs of the Original Film were expressly reserved by Park Avenue, and Borchers, not the Defendants, has the right to make spin-offs of the Original Film, a contention which Defendants have disputed or with which they have declined to agree.

51.     In support of his contention, Borchers provides the following:

a.     As alleged above, a motion picture sequel is a motion picture that continues the story or expands upon some earlier work.  Also as alleged above, a motion picture spin-off is a motion picture that focuses on a change in narrative viewpoint and activity from the previous storyline and shifts to that

action and overall narrative thread of some other character, which now becomes the central or main thread storyline of the new spin-off.  In other words, spin-offs tell the story of a character, who is not the original protagonist, making this secondary character the new protagonist in the new derivative motion picture.  *Cal.Civ.Code* 1645.

b.      The 1994 Agreement explicitly retained spin-off rights.  Paragraph 6, captioned, "Reservation of Rights," states, "Seller reserves all rights not specifically granted to Purchaser hereunder.  Purchaser acknowledges that the Rights do not include … without limitation, the characters portrayed therein …, " to wit: spin-offs (Exhibit Z, page 131).  This is reiterated in the Short Form Assignment attached to the 1994 Agreement (Exhibit Z, page 144), and there is no grant of rights of additional kind of any kind after the 1994 Agreement with the exception of the remake right provided in the 2005 Agreement.

c.      Paragraph 5 of the 1994 Agreement states, in relevant part, "… provided, however, that the foregoing shall not be construed to limit or restrict the reservation of rights by Seller…" (emphasis added) (Exhibit Z, page 130) To wit, the grant of rights could not possibly transfer spin-off rights, which are different from "sequels", something admitted by Lawrence Kuppin, the owner of Park Avenue, in a letter to Borchers' attorney written seven years ago on

October 4, 2010.[28]  [note:  as with the 1994 Agreement and the 205 Agreement, this is a document pertaining to copyright.  37 *C.F.R.* 201.4(a)(2)]. See *Cal.Civil.Code* 1646 (contract extends only to those things concerning which it appears that the parties intended to contract).

　　　　d.　　　In 2016 Borchers wrote a spec spin-off script based on themes and a character from the Original Movie and set out looking for the rights holder in order to purchase "spin-off" rights for a production.

　　　　e.　　　At the time, Dimension was holding itself out to be the owner of the spin-off rights.

　　　　f.　　　On May 3, 2016.  Borchers met with Matt Signer, head of production at Dimension and asked Signer to confirm that Dimension had the spin-off rights because Borchers wanted to acquire a license to make his spin-off.

　　　　g.　　　Signer was unable to confirm Dimension's rights, so through his lawyer, Borchers followed up with Sarah Sobel, the head of business affairs for Dimension.   On June 16, 2016, Sobel refused to confirm Dimension's rights.

　　　　h.　　　Unable to confirm that Dimension had spin-off rights, Borchers conducted extensive research and determined that the rights had never been transferred away by Park Avenue (see 1994 Agreement, Exhibit Z page 127

---

[28] See Exhibit CC.

and the 2010 Kuppin Letter, Exhibit BB page 152), and Borchers eventually obtained them by way of a transfer from Park Avenue to Graphic Novel to Borchers as set forth above.

i.  In or about April 2017, through his counsel Borchers again contacted Dimension and told Dimension that Borchers was now asserting ownership of the spin-off rights.  Dimension immediately disputed Borchers' claim of ownership.

j.  On or about June 19, 2017, Borchers contacted Miramax and was eventually advised that Miramax would not confirm the status of the spin-off rights, if any.

57.  Judicial intervention is necessary to resolve this dispute so that Borchers' rights are protected.  Therefore, Borchers seeks a judicial determination to resolve the issue of the ownership of spin-off rights to the Original Picture.  Absent this Court's declaration of Borchers' rights, and a resolution of legal uncertainties, he cannot submit any production, including a spin-off, for Copyright registration without concern for engaging in a potentially unlawful use or facing criminal liability.  17 *USC* 103(a); 17 *USC* 506(e).  And, if Borchers is able to produce, because the Defendants have denied, or refused to acknowledge, his rights, Borchers faces a potential infringement action by the Defendants.  See *Medimmune, Inc. v. Genentech, Inc*. (2007) 549 U.S. 118, fn. 11**.**

**WHEREFORE, Plaintiffs pray for judgment from this Court against Defendants and in Plaintiff's favor as follows:**

**A.     On the First Cause of Action:**  For a judicial declaration that Defendants' right, under the 2005 Agreement, to make any version of the Original Film is limited to one such film and that Borchers, and not the Defendants, has the right to remake the Original Film.

**B.     On the Second Cause of Action:** For a judicial declaration that after the production and distribution of a sixth sequel in 2001, there was never an assignment of sequel rights to the Defendants for the Original Film, such that Borchers, and not the Defendants, has the right to make sequels of the Original Film.

**C.     On the Third Cause of Action:** For a judicial declaration that Borchers, not the Defendants, has the right to make spin-offs of the Original Film.

**D.     On All Causes of Action**

1.     For costs of suit.

2.     For an award of attorney fees and expert fees in bringing and maintaining this action.  17 USC 505; *Fogerty v. Fantasy*, *Inc.*  (1994) 510, U.S. 517.

3.     An award to Plaintiff of any other relief that the Court deems just and proper under the circumstances of this case.

Dated:      August 23, 2017

Richard L. Charnley
Annie Rian
Attorneys for Plaintiff
DONALD P. BORCHERS

# DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action.

Dated:        August 23, 2017

Richard L. Charnley
Annie Rian
Attorneys for Plaintiff
DONALD P. BORCHERS

4824-2695-2526, v. 1

- 31 -