Richard L. Charnley (State Bar No. 70430)
Annie Rian (State Bar No. 260960)
**CHARNLEY RIAN LLP**
12121 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
Telephone:  310.321.4300
Facsimile:   310.893.0273
Email:        rlc@charnleyrian.com
                   ar@charnleyrian.com

Attorneys for Plaintiff DONALD P. BORCHERS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD P. BORCHERS,<br><br>Plaintiff,<br><br>v.<br><br>THE WEINSTEIN COMPANY, LLC d/b/a DIMENSION FILMS; MIRAMAX, LLC; THE WALT DISNEY COMPANY; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.  2:17-cv-6263<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)**<br><br>**REQUEST FOR JURY TRIAL SUBMITTED WITH ORIGINAL COMPLAINT**<br><br>**[This First Amended Complaint is filed pursuant to permission provided Plaintiff by Hon. George H. Wu on December 18, 2017]** |

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff alleges the following against Defendants and each of them:

**Jurisdiction, Venue, and The Parties**

1.  This is an action seeking declaratory relief regarding rights, as alleged below, to a copyrighted work by Stephen King (U.S. Copyright B00000204066, renewed RE000921889). Also involved is the film *Children of the Corn* (U.S.

- 1 -

Copyright V2024P222), and certain characters in the film. U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* 818.4(H) "Characters." *Christensen v. Harris County* (2000) 529 U.S.576, 587 (re consideration of administrative manuals and similar materials). As alleged herein, the rights in Stephen King's copyrighted work have been divided and are held by different parties. This action, therefore, seeks relief arising under an Act of Congress relating to copyrights and the authorization of exclusive rights thereunder (17 *USC* 101; 106) and is subject to the exclusive authority of this Court as provided in 28 *USC* 1338. In addition, the contracts referenced below place jurisdiction in the State of California and the Federal Courts of California.

2. Declaratory relief is sought pursuant to 28 *USC* 2201, which is available in intellectual property settings. *Medimmune Inc. v. Genetech, Inc.* (2007) 549 U.S. 118.

3. The United States District Court, Central District of California is the proper venue for this action under 28 *USC* 1391 because, as alleged below, a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

4. Plaintiff Donald P. Borchers ("Borchers") is a resident of the State of Florida. He is a producer, director, and writer in the entertainment industry.

5. On information and belief, Defendant Miramax LLC ("Miramax") is a limited liability company licensed to do business in the State of California, maintaining its principal place of business in the City of Santa Monica, State of California.

6. On information and belief, Defendant Walt Disney Company ("Disney") is a corporation licensed to do business in the City of Burbank, State of California.

7. On information and belief, Defendant The Weinstein Company, LLC ("TWC"), d/b/a/ Dimension Films ("Dimension") is a business entity organized

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

1  under the laws of the State of Delaware. Dimension's principal place of business is
2  in New York, New York. Reference to "Dimension" in this pleading shall include
3  TWC.
4      8.    Borchers is ignorant of the true names and capacities of those
5  defendants named herein as Does 1 through 50 and therefore sues these defendants
6  by their fictitious names. Borchers will seek leave to amend this Complaint to
7  assert the true names and capacities of said Doe Defendants when, and if, they have
8  been ascertained.
9      9.    On information and belief, each of the Defendants herein, whether
10 individually named or, in the case of Does, collectively named, is the agent,
11 principal, employer, employee, partner, joint-venturer, managing member, officer
12 or director of each other Defendant and in such capacity, was, at all times, acting
13 with full authority of each other Defendant. On further information and belief, each
14 of the Defendants named herein authorized and/or ratified the acts of each other
15 Defendant.

**Terms of Art**

17     10.    In this Complaint, three terms of art are used, namely "Remake,"
18 "Sequel" and "Spinoff". The following provides an analysis of these terms.
19     11.    **Remake:** A motion picture Remake is a film "...that is based on an
20 earlier work and tells the same story..." *Wikipedia.*[1] *FRE* Rule 803 (18)(A).
21 Essentially, it is a re-telling of the original story. When a remake is anticipated to
22 spawn sequels it is called a "Reboot." Remake is used when the film is to be a
23 "stand-alone" or "one-off." AN AFFAIR TO REMEMBER, a 1957 American
24 romance film, was a remake of the 1939 film, LOVE AFFAIR. *Wikipedia.*[2]

---

[1] see Exhibit, "A", https://en.wikipedia.org/wiki/Remake. Page 18 (Arabic numbers cite to consecutive page of this document where the Exhibit is found).

[2] see Exhibit, "B", https://en.wikipedia.org/wiki/An_Affair_to_Remember. Page 22

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

12. **Spinoff:** A motion picture Spinoff is a motion picture "...derived from one or more already existing works, that ... focuses [on] a substantial change in narrative viewpoint and activity from that (previous) storyline ... and **is a shift to that action and overall narrative thread of some other protagonist**(s), which now becomes the central or main thread (storyline) of the new sub-series..." *Wikipedia.*[3] (emphasis added). A Spinoff follows the original story in a different way, typically developing the story of one of the co-starring or ancillary characters.

13. **Sequel:** And, a motion picture sequel is a film "...that continues the story of, or expands upon, some earlier work..." *Wikipedia.*[4] It is a continuation of the original story. When a Sequel continues the prior story it is called a Pre-quel. Sequel rights typically include Pre-quel rights.

### Remakes and Spinoffs Are Two Different Things

14. "THE MATRIX reboot is not a remake or reboot, according to screenwriter Zac Penn – who alludes to a spin-off." *Daily Express*, March 17, 2017.[5] and, "While original reports claimed 'The Matrix' was being rebooted, writer Zak Penn took to Twitter Friday to clarify he's instead working on a spinoff project set within the Matrix universe." *Digital Trends*, March 17, 2017.[6] *FRE* Rule 803(18)(A).

### Sequels and Spinoffs Are Two Different Things

15. A spinoff, not a sequel, to SUICIDE SQUAD is in the works, "... Warner Bros. has been developing a spinoff with the help of Robbie ..." *The Hollywood Reporter*, August 9, 2016[7]. *FRE* Rule 803(18)(A) and, "WE'LL GET MORE MARGOT ROBBIE AS WARNER BROS. AND DC DEVELOP

---

[3] see Exhibit, "C", https://en.wikipedia.org/wiki/Spin-off_(media). Page 26
[4] see Exhibit, "D", https://en.wikipedia.org/wiki/Sequel Page 40
[5] see Exhibit, "E" Page 48
[6] see Exhibit, "F" Page 51
[7] see Exhibit, "G" Page 54

- 4 -
FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

|   |   |
|---|---|
| 1 | 'HARLEY QUINN VS. THE JOKER' SPINOFF" *Maxim*, July 23, 2017.[8] *FRE* Rule |
| 2 | 803(18)(A). And, "... the yet-to-be-confirmed project seems to be in addition to |
| 3 | Suicide Squad 2 ..." *The Express Tribune*, July 24, 2017[9] which, again, |
| 4 | differentiates the Suicide Squad 2 sequel from the Harley Quinn spinoff, which |
| 5 | spins off the character, Harley Quinn. *FRE* Rule 803(18)(A). |
| 6 |     16.    CREED is a Spinoff of ROCKY, not a sequel, "...director Ryan |
| 7 | Coogler says he never imagined setting his "Rocky" spin-off anywhere but |
| 8 | Philadelphia, the location of the original "Rocky" movie and its five sequels..." *The* |
| 9 | *Morning Call*, August 7, 2017[10]. *FRE* Rule 803(18)(A) and, "Based on characters |
| 10 | created by Sylvester Stallone 40 years ago, Coogler's story was ultimately |
| 11 | approved by Stallone himself, but getting that green light wasn't easy. "I was dead |
| 12 | set against it," Stallone revealed of his initial reaction to the notion of a spinoff |
| 13 | film." *Total Rocky*, November 3, 2015[11] *FRE* Rule 803(18)(A) and, "A new |
| 14 | screenplay titled "Drago" was filed with the copyright office, based on Sylvester |
| 15 | Stallone's popular Rocky IV character, Ivan Drago, played by actor Dolph |
| 16 | Lundgren in the 1985 Rocky movie." *Total Rocky*, November 3, 2015[12] This |
| 17 | spinoff follows the character, Drago. |
| 18 |     17.    THE TRANSFORMERS has spawned both sequels and spin-offs. |
| 19 | "...Paramount has planned at least 14 sequels and spinoff movies... one of the |
| 20 | Transformers spin-off movies to take place in Ancient Rome... (while) The fifth |
| 21 | movie in the Transformers franchise expands the mythology of the world, revealing |
| 22 | that Autobots and Decepticons have been interfering in human history since |
| 23 | medieval England, appearing again in World War II, and presumably other time |

---

[8] see Exhibit, "H" Page 56
[9] see Exhibit, "I" Page 57
[10] see Exhibit, "J" Page 59
[11] see Exhibit, "K" Page 65
[12] see Exhibit, "L" Page 74

- 5 -

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

periods as well..." *Slash Film*, June 14, 2017[13] *FRE* Rule 803(18)(A) and, "...John Cena has nabbed a lead role in the Transformers spinoff Bumblebee..." *The Hollywood Reporter*, July 31, 2017[14] *FRE* Rule 803(18)(A). Discussions of non-starring character spin-offs abound, "...A common complaint about the Transformers movies is that the robots take a backseat to the humans. Sam Witwicky, Cade Yeager—these are the main characters of the Transformers movies, not Optimus Prime and Megatron. You might think a spinoff film focusing on one specific Transformer could change that. But don't hold your breath. The Hollywood Reporter is reporting that Hailee Steinfeld is in talks to star in the 2018 Bumblebee Transformers spin-off, from Kubo and the Two Strings director Travis Knight. She'll play "a tomboy who also holds a job as a mechanic after school,"..." *Gozmodo io9*, May 31, 2017[15]. *FRE* Rule 803(18)(A). And that is why this is a spinoff in the TRANSFORMERS series, and not a sequel, because it follows an ancillary character, not the main story, itself.

18.  Michael Douglas' ex-wife, Diandra who is entitled to share future Spin-off income with Michael, brought suit against Michael for her share of WALL STREET 2. Michael's defense was that WALL STREET 2 was a Sequel and not a Spin-off, and Diandra was not entitled to Sequel money. "... Sequels, (his lawyer, Marilyn) Chinitz said, are not spinoffs, and Diandra has no right to any money from a sequel. "They're not the same thing," she said... **Justice Cooper indicated that he thought there was a difference between a spinoff and a sequel as well...**" *New York Post*, June 28, 2010[16] (emphasis added). *FRE* Rule 803(18)(A).

**Sequels Continue a Franchise, Spinoffs Expand a Franchise.**

19.  After Disney purchased LucasFilm in October 2012, Forbes reported, "The Mouse House has already scheduled a seventh film in the Star Wars saga to be

---

[13] see Exhibit, "M" Page 79
[14] see Exhibit, "N" Page 80
[15] see Exhibit, "O" Page 82
[16] see Exhibit, "P" Page 84

directed by J.J. Abrams and scheduled to hit theaters in 2015. Now comes reports that Disney will begin exploiting the broader Star Wars universe with spin-off movies featuring Han Solo and Boba Fett." *Forbes*, February 6, 2013.[17] There are 9 films in the Star Wars Franchise: an original, 5 Sequels and 3 prequels. The spin-offs follow a co-starring character, Han Solo and an ancillary character, Boba Fett. A distinction is made from sequels when referring to this film, a spin-off and not a sequel, "... actress Phoebe Waller-Bridge is in talks for a key role in the upcoming "Star Wars" Han Solo spinoff starring Alden Ehrenreich ..." *Variety*, February 8, 2017,[18] and, "...'Star Wars' Han Solo Spinoff: Lord & Miller Fired After Clashing With Kathleen Kennedy ..." *Variety*, June 20, 2017[19] and, "... Star Wars: Episode VII will launch a new trilogy next year, with Star Wars: Episode VIII following in 2017 and Star Wars: Episode IX coming in 2019. Lucasfilm is also planning an Untitled Star Wars Han Solo Spin-Off and Untitled Star Wars Boba Fett Spin-Off to debut in 2016 and 2018 ..." *Movieweb*, January 17, 2014[20] *FRE* Rule 803(18)(A)(3) and, "... And, big news "Star Wars" fans: Disney, which announced it would buy LucasFilm last year, plans to make spinoff movies based on characters in addition to the three sequels it had previously announced ..." *CNBC*, February 5, 2013[21] *FRE* Rule 803(18)(A). The point is illustrated clearly here that spinoffs are based on characters. *FRE* Rule18(A)(3).

20.    "...Lionsgate has won a bidding war to pick up a female- centric spec action script titled Ballerina that will serve as a platform for a possible John Wick spinoff... Lionsgate is relishing the idea of a franchise expansion..." *The Hollywood Reporter,* July 25, 2017.[22] *FRE* Rule18(A)(3).

---

[17] see Exhibit, "R" Page 87
[18] see Exhibit, "S" Page 89
[19] see Exhibit, "T" Page 91
[20] see Exhibit, "U" Page 95
[21] see Exhibit, "V" Page 97
[22] see Exhibit, "W" Page 99

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

21. "...The Conjuring franchise continues to expand, with New Line Cinema getting to work on a Conjuring 2 spinoff based around the character of the Crooked Man... The Crooked Man made his first appearance in The Conjuring 2 (the sequel to The Conjuring)... The Crooked Man, the next chapter in this growing universe... The next spinoff from the main film series will be The Nun..." *The Hollywood Reporter*, June 14, 2017.[23] *FRE* Rule18(A)(3).

22. For Lionsgate, the sequels to DIVERGENT have stopped performing, so they are expanding their franchise with a TV spinoff, "...Lionsgate has opted to skip theaters for the planned finale, The Divergent Series: Ascendant. Instead, the dystopian YA saga will conclude with a TV movie that will then launch a standalone spinoff TV series..." *Slash Film*, July 20, 2016.[24] *FRE* Rule18(A)(3).

### Chain of Title to "Children of the Corn"

23. On information and belief, in 1977, Stephen King copyrighted a novella named "Children of the Corn" ("the Novella") (U.S. Copyright B00000204066; RE 0000921899).

24. On information and belief, in or about August 1983, a company known as New World Pictures acquired the motion picture and allied rights to the Novella other than certain literary rights retained by Steven King.

25. In 1984, New World produced and distributed a feature film based on the Novella (herein "the Original Film") (U.S. Copyright V2024P222).

26. On November 28, 1989, New World granted to a company known as Oceana Distributors L.P. ("Oceana") all of New World's right, title, and interest in and to New World's film library ("the Library"), which included the Original Film, but New World retained U.S. television distribution rights to the Library and television remake, sequel and spinoff rights. In 1997 Fox Television merged with New World, thus making Fox TV the successor to the rights held by New World.

---

[23] see Exhibit, "X" Page 102
[24] See Exhibit "X" Page 105

- 8 -

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

27. Oceana became Trans Atlantic Distributors, L.P. ("Trans Atlantic"), and by a series of transactions that concluded in 1991, Park Avenue Entertainment ("Park Avenue") became the assignee of Oceana/Trans Atlantic's rights in the Original Film itself, not the entire Library, namely, the right to produce remakes, sequels, spinoffs, merchandising, and the like.

28. In 1994 Park Avenue entered into an agreement with Miramax, at the time a division of Disney, concerning the Original Film only, permitting Miramax the right to make only sequels or remakes of the Original Film, a copy of which is attached hereto as Exhibit Y and incorporated herein by this reference ("the 1994 Agreement" – 127, etc.)[25]. In the 1994 Agreement, Park Avenue did not transfer the distribution rights held by Oceana/Trans Atlantic to the Original Film. In the 1994 Agreement, Park Avenue expressly retained for itself all rights to the first sequel (previously made) and second sequel (on information and belief, not yet then released) to the Original Film (collectively, the "Park Avenue Sequels"). In the 1994 Agreement, Park Avenue expressly retained for itself any elements of the Original Film or any of the Park Avenue Sequels, including specifically the "characters portrayed therein or the title thereof" (See Exhibit Y, the 1994 Agreement, paragraph 1.f. – page 127). This is a document pertaining to copyright. 37 *C.F.R.* 201.4(a)(2).

29. On information and belief, and although unknown to Plaintiff at the time the Complaint was filed, in May 2000, Miramax purportedly exercised rights under the 1994 Agreement to acquire the right to produce what the 1994 Agreement referred to as a "Sixth Sequel" of *Children of the Corn* and at the same time exercised rights to produce further sequels (i.e. after the Sixth Sequel) to *Children of the Corn* under paragraph 5 of the 1994 Agreement (herein "Paragraph 5");

---

[25] Arabic numbers following references to Exhibits Y, Z, and AA are to the consecutively numbered pages of this Complaint, not the internal numbers of the exhibits themselves.

- 9 -
FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

however at this time Miramax did not notify Park Avenue that it was exercising rights under Paragraph 5 for remakes of *Children of the Corn.*

30. In 2005 Park Avenue entered into an agreement with Miramax, at the time a division of Disney, regarding the Original Film ("the 2005 Agreement"), a copy of which is attached hereto as Exhibit Z and incorporated herein by reference. In the 2005 Agreement, Miramax acquired only the remake rights to the Original Film (and ancillary rights associated therewith). Exhibit Z, page 127, paragraph 1. This is a document pertaining to copyright. 37 *C.F.R.* 201.4(a)(2).

31. Later in 2005 Bob Weinstein & Harvey Weinstein, acquired the label "Dimension Films" and left Miramax (which continued as a division of Disney). They formed TWC.

32. On information and belief, through its acquisition of Dimension, TWC obtained from Disney an option only for those rights obtained by Miramax under the 1994 and 2005 Agreements.

33. On information and belief, Disney remained a participant in future/ongoing productions by either Miramax or TWC.

34. In November 2016, Graphic Novel Enterprises ("Graphic Novel") purchased all of Park Avenue's right, title, and interest, in and to the Original Film. (See paragraph 29e. above.)

35. On July 27, 2017, Borchers acquired all of the rights that Graphic Novel obtained from Park Avenue.

**Why Plaintiff Needs Declaratory Relief**

36. Borchers has written a screenplay based on a character from the Novella and the Original Film. The action is set in the future. He wants to produce and distribute a film based on his rights. To do so he needs to obtain a clear chain of title to his right to produce and distribute his film. A dispute arose between and among Borchers on one and Defendants on the other regarding the ownership of the right to produce films in the *Children of the Corn* franchise. Borchers contended

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

that Graphic Novel purchased rights from Park Avenue, and he, in turn, obtained these rights from Graphic Novel.

37. In support, Borchers alleges:

    a. The rights to make a film based on characters portrayed in the Original Film were expressly reserved by Park Avenue, and Borchers has the right to make a non-TV, non-remake, non-sequel, spinoff film based on character(s) portrayed in the Original Film (Exhibit Y, paragraph 1.f. -- 108).

    b. In addition, and alternatively, the rights to make a non-TV spinoff of *Children of the Corn* were expressly reserved by Park Avenue, and Borchers, not the Defendants, has the right to make spinoffs.

    c. Borchers has asked Defendants to acknowledge, among other things, that he is the owner of the above rights, but Defendants have either refused to do so or have disputed his claim, affirmatively asserting "adverse legal interests". Hence, Defendants have placed Borchers in the position of having to choose between engaging in arguably infringing activity or abandoning his rights. This has created an actual and substantial controversy between Borchers and Defendants. *SanDisk Corp. v. STMicroelectronics, Inc.* (Fed.Cir. 2007) 480 F.3d 1372; *IMS Healty, Inc. v. Vality Tch, Inc.* (E.D. Pa. 1999) 59 F.Supp.2d 454 (declaratory judgment in copyright context).

38. Absent this Court's declaration of Borchers' rights, and a resolution of legal uncertainties, Borchers cannot submit any production, or even his screenplay based on his rights, for Copyright registration without concern for engaging in a potentially unlawful use or facing criminal liability. 17 *USC* 103(a); 17 *USC* 506(e).

39. And, if Borchers is able to produce a film based on his screenplay, because the Defendants have denied, or refused to acknowledge, his rights, Borchers faces a potential infringement action by the Defendants. See *Medimmune, Inc. v. Genentech, Inc.* (2007) 549 U.S. 118, fn. 11.

40. This action is brought with reference to FRCP Rule 57, which provides among other things, that the Court can order a speedy hearing of a declaratory relief action. Here, a speedy hearing is necessary because under no circumstances will Borchers has more than an optimal two-year period in which to solicit financing, produce and distribute a film based on his screenplay.

## FIRST CAUSE OF ACTION

### (Right to Produce Spinoff)

41. Borchers incorporates above paragraphs 1 through 40 by reference as is set forth in full in this cause of action, including the allegation that, in addition and alternatively, the rights to make a non-TV spinoff of the Original Film were expressly reserved by Park Avenue, and Borchers, not the Defendants, has the right to make spinoffs of the Original Film.

42. As alleged above, a spinoff is a motion picture that focuses on a change in narrative viewpoint and activity from the previous storyline and shifts to that action and overall narrative thread of some other character, which now becomes the central or main thread storyline of the new spin-off. In other words, spin-offs tell the story of a character, who is not the original protagonist, making this secondary character the new protagonist in the new derivative motion picture. *Cal.Civ.Code* 1645.

43. The 1994 Agreement retains spinoff rights for Park Avenue:

    a. Paragraph 6 states, "Seller reserves all rights not specifically granted to Purchaser hereunder. Purchaser acknowledges that the Rights do

not include ... without limitation, the characters portrayed therein ...," to wit: spin-offs (Exhibit Y, page 112).

    b.    The reservation is restated in the Short Form Assignment attached to the 1994 Agreement (Exhibit Y, page 125).

    c.    Paragraph 5, contains the limitation "... **provided, however,** that the foregoing shall not be construed to limit or restrict the reservation of rights by Seller..." (emphasis added) (Exhibit Y, page 111)

    d.    The grant of rights to Miramax in the 1994 Agreement did not transfer spinoff rights to the Original Film because, per the admission of Lawrence Kopplin (the owner of Park Avenue) in a letter to Borchers' attorney written seven years ago on October 4, 2010, sequels (which were mentioned in the 1004 Agreement) and spinoffs (which were not) are different products.[26] [as with the 1994 Agreement and the 205 Agreement, this is a document pertaining to copyright. 37 *C.F.R.* 201.4(a)(2)]. See *Cal.Civil.Code* 1646 (contract extends only to those things concerning which it appears that the parties intended to contract).

44.    The foregoing is consistent with Miramax's inability to confirm the status of its ownership of spinoff rights, if any, to wit: on or about June 19, 2017, Borchers contacted Miramax and, on July 13, 2017, Miramax advised that it would not confirm the status of the spin-off rights, if any; it was not until November 22, 2017, three months after Borchers filed his initial complaint, that Miramax asserted for the first time that it acquired "spinoff rights" under the "allied and ancillary rights" in the 1994 Agreement.

45.    Judicial intervention is necessary to resolve this dispute so that Borchers' rights are protected. Therefore, Borchers seeks a judicial determination to resolve the issue of whether spinoff rights for the Original Film were transferred to Miramax by the 1994 Agreement or via any other agreement, to wit, that

---

[26] See Exhibit AA, page 133.

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

Borchers, and not the Defendants, has the rights to make spinoffs of the Original Film. Absent this Court's declaration of Borchers' rights, and a resolution of legal uncertainties, he cannot submit any production, including a spinoff, for Copyright registration without concern for engaging in a potentially unlawful use or facing criminal liability. 17 *USC* 103(a); 17 *USC* 506(e). And, if Borchers is able to produce, because the Defendants have denied, or refused to acknowledge, his rights, Borchers faces a potential infringement action by the Defendants. See *Medimmune, Inc. v. Genentech, Inc.* (2007) 549 U.S. 118, fn. 11.

46. This First Cause of Action is in addition, and alternative to, the Second Cause of Action alleged below.

47. This First Cause of Action is brought with reference to FRCP Rule 57, which provides, among other things, that the Court can order a speedy hearing of a declaratory relief action. Here, a speedy hearing is necessary because under no circumstances will Borchers has more than an optimal two-year period in which to solicit financing, produce and distribute a film based on his rights.

## SECOND CAUSE OF ACTION

### (Right to Make a Film Based on Characters)

48. Borchers incorporates above paragraphs 1 through 47 by reference as is set forth in full in this cause of action, including the allegation that, in addition and alternatively, the rights to make a film based on characters portrayed in the Original Film were expressly reserved by Park Avenue, and Borchers has the right to make a non-TV, non-remake, non-sequel, spinoff film based on character(s) portrayed in the Original Film.

49. The 1994 Agreement retained the right to make a film based on characters in the Original Film.

50. As referenced in the 1994 Agreement, the terms "allied and ancillary rights" are neither mutually exclusive nor duplicative --- rather, they are numerous, with each production spawning its own ancillary and allied rights; moreover, as referenced in the 1994 Agreement, even though some "remake rights" and "sequel rights" were granted to Miramax, certain "remake rights" and "sequel rights" were withheld and reserved by Park Avenue. As a result, the 1994 Agreement provides Borchers the right to make a "non-remake" "non-sequel" film based on characters expressly reserved in the Agreement.

51. Defendants disagree and deny that Borchers has any rights.

52. Judicial intervention is necessary to resolve this dispute so that Borchers' rights are protected. Therefore, Borchers seeks a judicial determination to resolve the issue of the ownership of Borchers rights, to wit, that Borchers has the right to make a "non-remake," "non-sequel" film based on characters expressly reserved in the 1994 Agreement. Absent this Court's declaration of Borchers' rights, and a resolution of legal uncertainties, he cannot submit any production, including a non-remake, non-sequel spinoff film based on character expressly reserved in the 1994 Agreement, for Copyright registration without concern for engaging in a potentially unlawful use or facing criminal liability. 17 *USC* 103(a); 17 *USC* 506(e). And, if Borchers can produce, because the Defendants have denied, or refused to acknowledge, his rights, Borchers faces a potential infringement action by the Defendants. See *Medimmune, Inc. v. Genentech, Inc.* (2007) 549 U.S. 118, fn. 11.

53. This Second Cause of Action is in addition, and alternative to, the First Cause of Action alleged above.

54. This Second Cause of Action is brought with reference to FRCP Rule 57, which provides, among other things, that the Court can order a speedy hearing of a declaratory relief action. Here, a speedy hearing is necessary because under no

- 15 -

FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201)

circumstances will Borchers has more than an optimal two-year period in which to solicit financing, produce and distribute a film based on his screenplay.

**WHEREFORE, Plaintiff pray for judgment from this Court against Defendants and in Plaintiff's favor as follows:**

**On the First Cause of Action:**
1. As an alternative, and in addition, to the relief requested in the Second Cause of Action, for a judicial declaration that Borchers, and not the Defendants, has the rights to make spinoffs of the Original Film.

**On the Second Cause of Action**
2. As an alternative, and in addition, to the relief requested in the First Cause of Action, for a judicial declaration that Borchers has the rights to make a non-remake, non-sequel spinoff film based on characters expressly reserved in the 1994 Agreement.

**On All Causes of Action**
3. That the Court order a speedy trial of this case.
   For costs of suit.
4. For an award of attorney fees and expert fees in bringing and maintaining this action. 17 USC 505; *Fogerty v. Fantasy, Inc.* (1994) 510, U.S. 517.
5. An award to Plaintiff of any other relief that the Court deems just and proper under the circumstances of this case.

Dated: December 18, 2017

_____
Richard L. Charnley
Annie Rian
Attorneys for Plaintiff
DONALD P. BORCHERS

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action.

Dated: December 18, 2017

_____
Richard D. Charnley
Annie Rian
Attorneys for Plaintiff
DONALD P. BORCHERS

4821-9423-5737, v. 1

## CERTIFICATE OF SERVICE

I am a citizen of the United States. My business address is 12121 Wilshire Blvd. Suite 600, Los Angeles, California 90025. I am employed in the County of Los Angeles, where this service occurs. I am over the age of 18 years, and not a party to the within cause.

I hereby certify that on this 18th day of December, I caused a copy of the foregoing FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF (28 U.S.C. 2201); REQUEST FOR JURY TRIAL to be filed with the Clerk of the Court using the Court's CM/ECF system, and to be served upon the following via Electronic Transmission, and via Facsimile as follows:

| | |
|---|---|
| Attorneys for The Walt Disney Company<br><br>Kimberly L. Buffington<br>Sarkis A. Khachatryan<br>PILLSBURY WINTHROP SHAW PITTMAN LLP | Kbuffington@pillsburylaw.com<br>Sarkis.khachatryan@pillsburylaw.com<br><br>Facsimile: (213) 629-1033 |
| Attorneys for The Weinstein Company<br><br>Charles N. Shephard, Esq.<br>Bertram Harris Fields<br>Greenberg Glusker Fields Claman and Machtinger LLP | cshepard@ggfirm.com<br>bfields@ggfirm.com<br><br>Facsimile: (310) 553-0687 |
| Attorneys for Miramax<br><br>Brian G. Wolf, Esq.<br>David B. Jonelis, Esq.<br>LAVELY SINGER | bwolf@lavelysinger.com<br>djonelis@lavelysinger.com<br>Facsimile: (310) 556-3615 |

*I declare under the penalty of perjury that the foregoing is true and correct. Executed on December 18, 2017*

/s/ Lauren N. Ewing
_____
Lauren N. Ewing

4841-6080-5205, v. 1